### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **MARIA CRUZ,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:14-cv-03308-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner, Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

### O R D E R  A N D  O P I N I O N[1]

Plaintiff Maria Cruz ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Acting Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act.[2]  For the reasons below, the undersigned **REVERSES** the final decision

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 1/13/15 & 1/20/2015).  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal Disability Insurance Benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act,

of the Commissioner **AND REMANDS** the case to the Commissioner for further

proceedings consistent with this opinion.

## I.     PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on August 3, 2007, alleging disability

commencing on April 18, 2004.   [Record (hereinafter "R") 116-24].   Plaintiff's

applications were denied initially and on reconsideration.   [*See* R51-54].   Plaintiff then

requested a hearing before an Administrative Law Judge ("ALJ").   [R66-67].   An

evidentiary hearing was held on October 8, 2009.   [R23-50, 429-54].   The ALJ issued

a decision on November 24, 2009, denying Plaintiff's application on the ground that

she had not been under a "disability" at any time from the application date through the

date of the decision.   [R10-16, 458-64].   Plaintiff sought review by the Appeals

---

42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled.   Title XVI claims are not tied to the attainment of a particular period of insurance disability.   *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.   *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.   *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

2

Council, and the Appeals Council denied Plaintiff's request for review on February 26, 2010, making the ALJ's decision the final decision of the Commissioner. [R1-3, 469-71].

Plaintiff then appealed the denial to this Court on April 23, 2010. *Cruz v. Astrue*, No. 1:10-cv-1244-ECS (N.D. Ga.), ECF No. 1. Following briefing, on September 13, 2011, the Court reversed the decision of the Commissioner and remanded the matter for further consideration. [R472-97 (*Cruz*, No. 1:10-cv-1244-ECS, ECF No. 15)]. A second hearing before a different ALJ was held on May 23, 2014. [R403-428]. The second ALJ issued a partially favorable decision on June 17, 2014, concluding that Plaintiff was not disabled prior to her fiftieth birthday on August 10, 2008, but became disabled on that date and continued to be disabled through the date of the decision. [R389-90].

Plaintiff then initiated a second action in this Court on October 15, 2014, seeking review of the Commissioner's latest decision. [*See* Doc. 1]. The answer and transcript were filed on March 19, 2015. [*See* Docs. 11, 12]. On April 20, 2015, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 13]; on May 20, 2015, the Commissioner filed a response in support of the decision, [Doc. 14]; and on June 2, 2015, Plaintiff filed a reply brief in support of her petition,

AO 72A
(Rev.8/8
2)

[Doc. 15].  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[3]

## II.    STATEMENT OF FACTS[4]

### A.    Background

Plaintiff's date of birth is August 10, 1958, [R116], and she was therefore forty-six years old on her date last insured, December 31, 2004, [R391], and fifty-five years old at the time of the ALJ's June 17, 2014, decision, [R397].  She is illiterate in English and has a very limited ability to communicate in English.  [R395].  She previously worked as a warehouse worker, a furniture inspector, and a food packer. [R421].  She claims that she became disabled as of April 18, 2004, due to high blood pressure and arthritis in her feet, knees, legs, hands, and arms.  [R141].

### B.    Lay Testimony

At the second administrative hearing, Plaintiff testified that she had a sixth-grade education and could read Spanish and write a little in Spanish.  [R409-10].  She stated

---

[3]    Neither party requested oral argument.  (*See Dkt., passim*).

[4]    In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 13-15].

4

that she stopped working in 2004 because of pain in her hands, arms, and lower back that caused her to drop things and to be unable to walk. [R410]. She stated that as of December 31, 2004, she had issues with activities such as writing, doing her hair, fastening buttons, and tying her shoes, and she could lift only five to ten pounds and would still drop things. [R417]. She testified that at the time, a high-school-age child lived with her and her husband but that she could only sometimes be responsible for feeding him and making sure he got up and went to school on time because she was not able to get up or walk well. [R412-13]. She reported that at the time, the only treatment she received was pills for the pain, and that because she did not have money for treatment, she just purchased Tylenol. [R410-11].

Plaintiff stated that when she stopped working, she also stopped doing household cooking and cleaning because of the pain. [R418]. She testified that by the end of 2004, she could not sit for longer than an hour, could not stand or walk more than ten or fifteen minutes before the pain would make her need to sit down or lie down, and she was dropping things. [R416-17]. She stated that in 2005, she was using a rented wheelchair because of her inability to walk very far, and that the wheelchair had since been prescribed by her treating physician. [R413-14]. She also reported using a cane

5

and walker at times but stated that sometimes her hands hurt too much to grab the walker.  [R414-15].

## C.   *Administrative Records*

In a field office disability report dated August 3, 2007, the interviewer observed that Plaintiff had difficulty reading, understanding, answering, sitting, standing, walking, using her hands, and writing.  [R136-39].  The interviewer further stated that Plaintiff's hands were "very swollen and painful-looking"; it was "hard for her to sign her name only twice"; her face reflected pain; she walked very slowly; she sat down very gingerly; her daughter helped her lower herself to the chair; she "had great difficulty getting up after sitting for about 50 minutes"; and she did not appear to understand any English at all.  [R138].

In an undated adult disability report, Plaintiff reported that her preferred language was Spanish and that she could not speak, read, write, or understand English. [R140-41].  She indicated that she had completed the ninth grade and that her education was in her native country in Spanish.  [R145-46].  She reported that she began seeing Michael Landers, D.O., in January 2004 for high blood pressure and pain in her legs and feet and that she received injections in her knees for arthritis in or before April 2004.  [R144].  She stated that she had not been able to go to the doctor because she

6

lacked medical insurance and could not afford to pay for doctor visits or prescriptions. [R146].

A medication list indicates that on November 26, 2007, Plaintiff was prescribed tramadol[5] for pain, prednisone[6] to treat arthritis, levothyroxine[7] to treat thyroid problems, and atenolol[8] and hydrochlorothiazide[9] to treat high blood pressure,

---

[5]     Tramadol, also sold under the brand name Ultram, is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. MedlinePlus, Tramadol, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited 3/28/16).

[6]     Prednisone is a corticosteroid commonly used to treat arthritis. MedlinePlus, Prednisone, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited 3/28/16).

[7]     Levothyroxine, also sold under the brand name Synthroid, is a thyroid hormone that works by replacing thyroid hormone that is normally produced by the body. MedlinePlus, Levothyroxine, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html (last visited 3/28/16).

[8]     Atenolol is a beta blocker that is used alone or in combination with other medications to treat high blood pressure. It is also used to prevent angina (chest pain) and to improve survival after a heart attack. MedlinePlus, Atenolol, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html (last visited 3/28/16).

[9]     Hydrochlorothiazide is a "water pill," and is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine.

AO 72A
(Rev.8/8
2)

[R214-15], and in May 2009, she began taking Enbrel injections[10] to treat rheumatoid arthritis ("RA"), [R215].

### D.   Medical Records

Plaintiff visited Gwinnett Hospital in March 2004, with complaints of back pain and knee pain, among other things.  [R267, 269, 273].  She was observed to have swelling, [R269], and both knees were tender to palpation, [R269, 273].  Current medications were Norvasc[11] and Tylenol.  [R269].

A lumbar x-ray taken on April 29, 2004, at Gwinnett Hospital showed a normal lumbar spine.  [R265, 292, 316].

------

MedlinePlus, Hydrochlorothiazide, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited 3/28/16).

[10]   Enbrel is a brand name for etanercept, an injectable medication used to relieve the symptoms of certain autoimmune disorders.  It works by blocking the action of one of the substances in the body that causes inflammation. MedlinePlus, Etanercept Injection, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602013.html (last visited 3/28/16).

[11]   Norvasc (amlodipine) is a calcium channel blocker that is used alone or in combination with other medications to treat high blood pressure and chest pain. MedlinePlus, Amlodipine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited 3/28/16).

AO 72A
(Rev.8/8
2)

On May 18, 2004, Plaintiff visited Resurgens Orthopaedics for pain in both knees and was seen by Scott G. Quisling, M.D. [R250, 288, 290]. In a medical history report, Plaintiff stated that both of her knees hurt, it was difficult to walk, and her symptoms had been going on for about ten months. [R242]. She also reported swelling in her ankles, stated that she had arthritis, and indicated that she was having problems with her joints, spine, neck, back, shoulders, hands, hips, knees, ankles, and feet. [R244, 246]. She also indicated that she exercised. [R247].

During her appointment, Plaintiff reported to Dr. Quisling that the pain had been going on for the past ten months, was significant and present just about every day, and sometimes made it difficult for her to work. [R250, 288, 290]. A patellar grind test was positive, and x-rays demonstrated some mild medial joint space narrowing in both knees. [R250, 288, 290]. Dr. Quisling found positive patellofemoral crepitus[12] and a possible small effusion[13] in the right knee but no obvious collateral ligament or cruciate ligament instability, and light-touch sensation and motor function were fully intact throughout both lower extremities. [R250, 288, 290]. The impression given was

[12]     Crepitus refers to noise or vibration produced by rubbing bone or irregular cartilage surfaces together. *PDR Med. Dictionary* 409 (1st ed. 1995).

[13]     Effusion refers to the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. *PDR Med. Dictionary* 547 (1st ed. 1995).

9

bilateral knee mild medial compartment degenerative joint disease.  [R250, 288].
Plaintiff was given cortisone injections in both knees and was told to stay on
anti-inflammatory medications.  [R250-51, 288-91].

On August 30, 2007, Plaintiff underwent a consultative examination with Julius
Olukayode Ajayi, M.D.  [R217-27].  Plaintiff alleged arthritis in her feet, knees, legs,
and hands, and she complained of diffuse neck, wrist, knee, and lower-back pain that
had lasted for four years.  [R217].  Plaintiff reported morning stiffness, persistent pain
in her hands that is worsened by minimal activity, lower-back pain that is worsened by
standing and sitting for long periods, and knee pain that makes it difficult for her to
walk or climb.  [R217].  She stated that the pain kept her from doing any household
work, that she was unable to drive or operate machines, and that her social activities
were limited because of the pain.  [R217].  She indicated that she had bilateral knee
injections with partial relief.  [R217-18].  Plaintiff also reported a ten-year history of
hypertension and admitted to headache, dizziness, chest pain, and intermittent blurry
vision, [R217-18], and she also reported sadness and crying spells, [R218].  She stated
that she had previously been on medication but because of the cost was presently taking
only Tylenol.  [R217].

10

Upon examination, Plaintiff was noted to be obese and in mild-to-moderate distress.  [R218].  There was swelling in her extremities, she had an abnormal gait, and had difficulty getting on the examination table.  [R218].  Plaintiff's knee joints were swollen, tender, and hyper-expanded; her range of motion was severely reduced; and there was a tenderness with passive movement.  [R218].  The range of motion in her neck joint was good, and the range of motion in her wrists and hands was "fairly preserved."  [R218].  X-rays of both hands showed evidence of arthritic changes, and an x-ray of the knee showed moderate-to-severe degenerative changes.  [R218].  Her power was 4/5 globally, but her hand grip was weak, especially on the right, with 4/5 grip strength on the left and 3/5 grip strength on the right.  [R218, 226].  Diagnoses were polyarticular arthralgia,[14] degenerative joint disease of the knee, hypertension, morbid obesity, and polyuria.  [R218].

Dr. Ajayi opined that Plaintiff had diffuse joint pain and associated arthritis, that clinical findings were "particularly severe at both knees, with inability to walk properly," and that Plaintiff had "evidence of arthritis of her hands with inability to use both hands."  [R218].  He further stated that Plaintiff had a history of hypertension with

---

[14]   "Arthralgia" is pain in a joint.  1-A *Attorneys' Dictionary of Medicine* A-11080 (Matthew Bender & Co., 2009).  "Polyarticular" refers to the involvement of many joints.  *PDR Med. Dictionary* 1135, 1401 (1st ed. 1995).

11

associated dizziness, chest pain, and headache, compatible with malignant hypertension, and that she was unable to afford any medication. [R218]. Dr. Ajayi also found reduced range of motion in Plaintiff's hips and knees. [R225]. He also noted that Plaintiff had a history of obesity, which was making her knee pain worse, and that her history of polyuria was suspicious for diabetes mellitus. [R218]. He also observed a history of depression. [R219].

X-ray findings from August 30, 2007, showed mild osteoarthrosis in the left knee, evidence of moderate osteoarthrosis in the right knee, and no abnormalities in the left hand, and suspected mild degenerative change in the radiocarpal joint space of the right hand. [R220-23].

On September 13, 2007, reviewing physician Terry W. Banks, M.D., M.P.H., completed a physical RFC assessment. [R228-35]. Dr. Banks opined that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; could occasionally climb ladders, ropes, or scaffolds; could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; and was limited to frequent fingering and feeling. [R229-31].

12

On September 18, 2007, Plaintiff presented to the Hope Clinic for treatment of a hot, swollen right hand, and arthritic pain in her hands, legs, and knees.  [R264].  She was observed to have an abnormal gait, difficulty bending due to joint pain, and a history of high blood pressure.  [R264].  She had decreased range of motion of her right wrist with tenderness; enlarged, tender knees with decreased range of motion; and decreased flexion with tenderness and edema in her ankles.  [R264].  She was prescribed DynaCirc.[15]  [R264].

At a visit to Hope Clinic taking place on October 2, 2007, Plaintiff's knees were again swollen and tender with restricted range of motion.  [R263].  She was prescribed lisinopril[16] and Indocin.[17]  [R263].

_____

[15]    DynaCirc (isradipine) is a calcium channel blocker and is used to treat high blood pressure.  MedlinePlus, Isradipine, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a693048.html (last visited 3/28/16).

[16]    Lisinopril is used to treat high blood pressure and used in combination with other medications to treat heart failure and to improve survival after a heart attack. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently.  MedlinePlus, Lisinopril, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html (last visited 3/28/16).

[17]    Indocin (indomethacin) is a non-steroidal anti-inflammatory drug ("NSAID") used to relieve moderate-to-severe pain, tenderness, swelling, and stiffness. MedlinePlus, Indomethacin,

AO 72A
(Rev.8/8
2)

On October 10, 2007, Plaintiff returned to Resurgens Orthopaedics with complaints of "excruciating" knee pain that had lasted for several years. [R239, 285]. She reported that the pain was making it difficult to walk and was preventing her from working. [R239, 285]. She had tenderness to palpation over her medial joint line, with mild edema. [R239, 285]. Light-touch sensation and motor function were intact. [R239, 285]. X-rays of Plaintiff's knees showed positive decreased midline joint space. [R239, 285]. The impression given was osteoarthritis of bilateral knees with a possible rheumatoid component. [R239, 285]. It was recommended that Plaintiff receive cortisone injections and see a rheumatologist. [R239, 285].

On October 18, 2007, Plaintiff had a follow-up visit with Kathleen Lloyd, NP-C, for a recheck of her joint pain. [R262]. It was noted that Plaintiff had been started on Synthroid two weeks prior. [R262]. Plaintiff was found to have moderate enlargement in her wrists and knees, hand range of motion that was slightly slow with some mild enlargement in the joints, and an abnormal gait described as "more of a waddle

https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html   (last   visited 3/28/16).

14

motion." [R262].  Impression given was acute inflammatory joint disease, hypothyroid function, and anemia.  [R262].  Plaintiff was started on diclofenac[18] for pain.  [R262].

On November 26, 2007, Plaintiff visited Nicholas A. Tiliakos, M.D. [R364].  No previous records were available, but Plaintiff reported a four-year history of inflammatory arthritis involving the wrists, knees, shoulder, elbows, and fingers, and she stated that it was initially episodic but more recently had become constant.  [R364].  She indicated that she had a lot of pain and that she had problems bending her fingers, standing, and walking.  [R364].  She further reported that she had been having lower-back pain for the past two years and could not sleep at night.  [R364].  She indicated that anti-inflammatory medications, initially diclofenac, and then indomethacin, were somewhat helpful, and that she had injections in the knees without significant improvement.  [R364].  On examination, Plaintiff was noted to be in acute distress, with decreased range of motion in the shoulders; to have synovitis[19] of the wrists, ankles, and joints in both hands, right greater than the left; to have knees with

_____

[18]     Diclofenac is an NSAID used to relieve mild to moderate pain.  *MedlinePlus*, *Diclofenac*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html  (last visited 3/28/16).

[19]     "Synovitis" is a term often used to refer to arthritis.  *PDR Med. Dictionary* 1746 (1st ed. 1995).

15

tense effusions; and to have problems standing and walking. [R364]. Dr. Tiliakos diagnosed inflammatory arthritis of unknown etiology, rule out rheumatoid, and rule out other autoimmune processes, and told Plaintiff to stop indomethacin and start prednisone and Ultram. [R364].

On follow-up on February 4, 2008, Dr. Tiliakos noted stiffness and swelling associated with arthritis but also wrote that there was "overall improvement." [R363]. He also repeated his diagnosis of inflammatory arthritis. [R363].

On February 8, 2008, non-examining state agency medical consultant Ramona Minnis, M.D., completed a physical RFC assessment. [R274-81]. Dr. Minnis opined that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; could occasionally climb ladders, ropes, or scaffolds; could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold. [R274-81].

On October 13, 2008, at an emergency-room visit for extreme nausea, it was noted that Plaintiff was taking tramadol and an unknown blood-pressure medication.

16

[R312].  It was further noted that she ambulated to and from the room "without difficulty with gait" and exhibited 5/5 motor strength.  [R312].

At a visit taking place on January 15, 2009, Dr. Tiliakos noted that Plaintiff had stiffness and swelling.  [R361].  He also stated that Plaintiff had RA and that it was stable.  [R361].

On May 12, 2009, Dr. Tiliakos completed a physical capacities evaluation. [R357-60].  He opined that when Plaintiff's RA is active, she is "unable to do anything" and would need the freedom to rest, recline, or lie down at her own discretion throughout the normal work day.  [R357-58].  He stated that the restrictions were supported by his findings of diffuse synovitis with joint effusion and joint contractures[20] and that he believed the level of severity had lasted for several years. [R359-60].  Dr. Tiliakos also opined that Plaintiff's RA was an impairment that could reasonably be expected to produce pain and/or fatigue at a level that would preclude Plaintiff from working a forty-hour work week.  [R360].

---

[20]      A contracture develops when tissues that are normally elastic are replaced by inelastic fiber-like tissue, which makes it hard to stretch the area and prevents normal movement.  MedlinePlus, Contracture Deformity, https://www.nlm.nih.gov/medlineplus/ency/article/003185.htm (last visited 3/28/16).

AO 72A
(Rev.8/8
2)

### E.    *Vocational-Expert Testimony*

At the second administrative hearing, a vocational expert ("VE") was asked to testify regarding the capabilities of a forty-six-year-old person with the same education and work experience as Plaintiff, who could perform light exertional work; could only occasionally climb stairs or ramps, bend, balance, stoop, crawl, kneel or crouch; could never climb ropes, ladders, or scaffolds; must avoid occupations with hazardous machinery, exposure to vibrations, and concentrated exposure to heat, cold, and moisture; would be limited to simple, routine, repetitive tasks; and could work in occupations involving frequent, but not constant, fingering, grasping, and handling bilaterally.  [R421].  The VE testified that the person would not be able to perform Plaintiff's past work as a warehouse worker, furniture inspector, or food packer, but could work as a small-parts assembler, electronics worker, or laundry folder.  [R421-22].  The VE also testified that if the person had the additional limitation of needing a sit-stand option no more often than every two hours, the person could still work as a small-parts assembler, but if the person could stand for no more than four hours total over the course of the day, the person would not be able to perform the jobs indicated.  [R423-24].

18

## III.   ALJ'S FINDINGS OF FACT

In the June 2014 decision, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2004.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   Since the alleged onset date of disability, April 18, 2004, the claimant has had the following severe impairments: rheumatoid arthritis, degenerative joint disease of the knees, morbid obesity, hypertension, hypothyroidism, dyslipidemia, and depression (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.   Since the alleged onset date of disability, April 18, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.   After careful consideration of the entire record, the undersigned finds that since April 18, 2004, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs, bend,

19

AO 72A
(Rev.8/8
2)

balance, stoop, crawl, kneel, and crouch; and frequently finger, grasp, and handle bilaterally.  The claimant should avoid occupations with hazardous machinery and exposure to vibrations, and avoid concentrat[ed] exposure to heat, cold, and moisture.  She needs a sit/stand option to adjust as necessary for comfort, but no more often than every two hours.  Mentally, she is limited to simple, routine, and repetitive tasks.

. . .

6.     Since April 18, 2004, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.     Prior to the established disability onset date, the claimant was a younger individual age 18-49.  On August 10, 2008, the claimant's age category changed to an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant is illiterate in English and has a very limited ability to communicate in English (20 CFR 404.1564 and 416.964).

9.     Prior to August 10, 2008, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.  Beginning on August 10, 2008, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Prior to August 10, 2008, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the

20

claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

. . .

11.   Beginning on August 10, 2008, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

. . .

12.   The claimant was not disabled prior to August 10, 2008, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13.   The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2004, the date last insured (20 CFR 404.315(a) and 404.320(b)).

[R391-97].

The ALJ explained that although he found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible because: the medical evidence does not support her allegations of disability; she "has not generally received the type of medical treatment

21

one would expect for a disabled individual"; when Plaintiff testified at the hearing, her appearance and demeanor were "generally unpersuasive"; and her testimony that she used a wheelchair since 2005 was uncorroborated.  [R393].  The ALJ then went on to review the objective medical findings, characterized them as "relatively benign," and concluded that, even in light of Plaintiff's obesity, they "support a reduced range of light work as evidenced in the residual functional capacity."  [R394-95].

The ALJ also detailed the weight he assigned to the opinion evidence.  He stated that he gave "great weight" to the opinions of the state agency physicians, Dr. Banks and Dr. Minnis, because he found the opinions to be consistent with the record as a whole.  [R395].  He explained that he assigned "some weight" to the opinion of treating physician Dr. Tiliakos because Dr. Tiliakos "was vague" and did not specify the timeframe in which he found Plaintiff to have become disabled; because the medical evidence did not support Dr. Tiliakos's disabling limitations; and because Plaintiff had only sporadic treatment between 2004 and 2008.  [R395].  He stated that he assigned "some weight" to the opinion of consultative examiner Dr. Ajayi because the opinion "d[id] not present a longitudinal picture" of Plaintiff's physical condition and because Plaintiff admitted she was not taking any prescribed medication at the time of the evaluation.  [R395].

22

In summary, the ALJ stated that the RFC was "supported by the objective evidence, [Plaintiff's] course of treatment, and her daily activities." [R395]. The ALJ then explained that because he found Plaintiff to be unable to perform her past work, he relied on the VE's testimony that a person of Plaintiff's age, education, and RFC was capable of working as a small-parts assembler, electronics worker, and laundry folder, and he therefore found Plaintiff capable of work existing in significant numbers in the national economy until she reached age fifty on August 10, 2008. [R396].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in

23

any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a

24

listed impairment, he must prove that his impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

25

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

26

a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff raises numerous allegations of error. First, she argues that the evidence prior to August 10, 2008, establishes that Plaintiff was unable to stand for long periods of time due to synovitis, pain, and swelling of her joints. [Doc. 13 at 10-13]. Second, Plaintiff contends that the ALJ erred when he failed to credit the opinions of treating physician Dr. Tiliakos and examining physician Dr. Ajayi. [*Id*. at 13-15, 25-26]. She

27

further contends that rather than simply discounting Dr. Tiliakos's opinion for vagueness regarding the disability-onset date, the ALJ should have called on the services of a medical advisor to determine when Plaintiff became disabled.  [*Id*. at 15].  Third, Plaintiff argues that the ALJ did not explain what evidence supports his finding that Plaintiff is able to sit or stand for two-hour stretches and failed to reconcile that finding—which Plaintiff contends implies that she will need to alternate sitting and standing over the course of the day, resulting in four hours total of sitting and four hours total of standing—with his determination that Plaintiff can perform light work. [*Id*. at 16-17].  Fourth, Plaintiff contends that the hypothetical question to the VE did not encompass her inability to communicate in English, was therefore incomplete, and thus could not elicit a response that may constitute substantial evidence to support the ALJ's decision.  [*Id*. at 17-19].  Fifth, Plaintiff argues that the ALJ erred in evaluating her credibility because (1) he applied an improper legal standard when he found that she "had not generally received the type of medical treatment one would expect for a disabled individual"; (2) he improperly drew an adverse inference from Plaintiff's failure to pursue treatment without considering her reason for the lack of treatment; (3) he engaged in improper "sit and squirm" jurisprudence; (4) his reasons for doubting the wheelchair testimony were unreasonable; (5) he did not discuss the regulatory

28

factors in evaluating Plaintiff's credibility; and (6) his contention that Plaintiff's daily activities support the RFC is not backed by evidence.  [*Id*. at 19-24].

In response, the Commissioner argues that the ALJ applied the proper legal standards and that the decision is supported by substantial evidence. [Doc. 14].  First, she contends that the ALJ properly considered the objective medical evidence and fashioned the RFC to accommodate the clinical findings.  [*Id*. at 4-7].  She further argues that given the definition of light work in the regulations, the ALJ was not required to specifically discuss Plaintiff's ability to perform each of the exertional demands associated with light work, [*id*. at 7], and she asserts that in suggesting that the ALJ's stated sit-stand requirements conflict with the regulatory definition of "light work," Plaintiff mischaracterizes the ALJ's RFC finding, [*id*. at 8].  The Commissioner also points out that upon review, the question is not whether some evidence might support more limitations but instead is whether substantial evidence supports the ALJ's decision.  [*Id*. at 8-9].

Second, the Commissioner argues that the ALJ appropriately discounted the opinions of Dr. Tiliakos and Dr. Ajayi and gave great weight to the opinions of Dr. Banks and Dr. Minnis.    [*Id*. at 9-16].  She contends that the ALJ properly discounted Dr. Tiliakos's opinion as conclusory, vague, and unsupported by the

29

objective medical evidence, and that he properly discounted Dr. Ajayi's opinion because it did not present a longitudinal picture of Plaintiff's physical condition, because a consulting physician's opinion is not entitled to any special deference or consideration, and because the opinion is not fully supported by the objective medical evidence. [*Id*. at 9-13]. She also suggests that it was, at worst, harmless error for the ALJ to discount the opinions based on Plaintiff's sporadic treatment because the ALJ also offered other reasons to discount the opinions and the medical notes suggest that Plaintiff was in fact able to obtain medication. [*Id*. at 13-14]. The Commissioner further avers that this is a circumstance where the opinions of non-examining physicians are entitled to greater weight than the opinions of treating or examining sources, and she points out that the ALJ had the responsibility of assessing Plaintiff's RFC based on all of the relevant evidence, not just a doctor's opinion. [*Id*. at 14-15]. She also contends that the medical evidence here was not ambiguous, and therefore there was no need to engage the services of a medical advisor in order to determine the disability onset date. [*Id*. at 15-16].

Third, the Commissioner contends that the ALJ's hypothetical question to the VE was not incomplete because Plaintiff used an interpreter at the hearing and testified that she had a sixth-grade education and could read and write a little in Spanish; the VE was

30

present at the hearing and testified that he heard the testimony; and the ALJ expressly asked the VE to consider a hypothetical individual with Plaintiff's age, education, and work experience.  [*Id*. at 16-17].  Alternatively, she argues that the omission was harmless because the regulations provide that inability to communicate in English does not substantially limit the scope of light, unskilled work and because Plaintiff's counsel did not ask whether a limited proficiency in English would prevent the hypothetical individual from performing the identified jobs.  [*Id*. at 17-18].

Fourth, the Commissioner argues that the ALJ properly found that Plaintiff's subjective complaints were not credible.  [*Id*. at 18-25].  She points out that the regulations do not require the ALJ to discuss every credibility factor in the decision so long as it is clear that the ALJ considered the claimant's condition as a whole, and she contends that the ALJ did so here.  [*Id*. at 19].  She also suggests that it was harmless error for the ALJ to make an adverse inference based on her lack of treatment because the lack of treatment was not the sole basis for the ALJ's decision to deny benefits. [*Id*. at 19-20].  The Commissioner further implies that the ALJ did not reversibly err when he found that Plaintiff had "not generally received the type of medical treatment on would expect for a disabled individual" because the record shows that Plaintiff's treatment was generally conservative.  [*Id*. at 20-21].  She also argues that the ALJ did

31

not engage in an improper "sit and squirm" test because he "merely noted Plaintiff's demeanor as one of many factors undermining the credibility of her allegations," which he is permitted to do under the regulations.  [*Id*. at 21-22, 24-25].  Similarly, the Commissioner asserts that the ALJ was permitted to consider Plaintiff's daily activities in evaluating her credibility and that, even if it was error to do so, the error was harmless because the daily activities constituted one factor of many that the ALJ considered in reaching his credibility determination.  [*Id*. at 25].  Additionally, the Commissioner contends that Plaintiff cannot show prejudice or violation of her due process rights because the ALJ provided Plaintiff with a full and fair hearing where she was represented by counsel and had an opportunity to present all of the information relevant to her claim.  [*Id*. at 22-23].

## VII.   DISCUSSION

Were Plaintiff's appeal limited to her argument that the evidence shows that she was unable to stand for long periods of time prior to August 10, 2008, the Court would find no basis for reversal.  As discussed above, even where a reviewing court finds the evidence to preponderate against the ALJ's RFC, it may not reweigh the evidence or substitute its judgment for that of the Commissioner so long as the ALJ applied the proper legals standards and made clear that the decision is based on evidence that a

reasonable mind might accept as adequate to support the conclusion and that would be enough to justify a refusal to direct a verdict were the case before a jury, [Doc. 13 at 10-13]. *See supra* Part V. For similar reasons, the undersigned finds no reversible error arising from the ALJ's determination that the lack of any mention of wheelchair use in the medical record called into question Plaintiff's testimony that she had used a wheelchair since 2005, [Doc. 13 at 21]. *See supra* Part V.

The Court also is not persuaded that there is tension between the ALJ's determination that Plaintiff can perform a limited range of light work and the limited sit/stand option (need to adjust position for comfort no more often than every two hours) articulated in the RFC and the hypothetical question posed to the VE. [*See* Doc. 13 at 16-17; *see also* R392, 422-23]. The Agency states that in order to perform a full range of light work, a person must have the ability to stand or walk, "off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *6.[21] Contrary to Plaintiff's representation,

---

[21]   Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process. *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)). Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also*

AO 72A
(Rev.8/8
2)

the ALJ did not find that Plaintiff was able to stand or sit only for two-hour stretches, to be followed by a two-hour stretch of the alternate posture, [*see* Doc. 13 at 16-17], but rather stated that Plaintiff would be able to sit or stand for at least two hours without needing to adjust for comfort, [R422-23].  Thus, the Court finds that light work is not incompatible with the limited sit/stand opinion appearing in the RFC and hypothetical question.

Nevertheless, the Court finds that Plaintiff has shown that the ALJ's decision contains numerous errors of law and fact, and it therefore concludes that the ALJ's decision is due to be reversed.  Each issue bearing reconsideration upon remand will be discussed below in its logical order.

### A.     *Plaintiff's Intermittent Treatment Record*

In his decision, the ALJ discounts Plaintiff's credibility because, among other reasons, she "has not generally received the type of medical treatment one would expect for a disabled individual," [R393], she "did not maintain regular treatment," [R394],

---

*Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A
(Rev.8/8
2)

and she "admitted that she was not taking any prescribed medication," [R394]. The ALJ also gave Dr. Tiliakos's opinion only "some weight" because, among other reasons, "[b]etween 2004 and 2008, [Plaintiff] had sporadic medical treatment," [R395], and she gave Dr. Ajayi's opinion only "some weight" because it was a based on a one-time examination and Plaintiff "admitted she was not taking any prescribed medication at the time of the evaluation," [R395].

It is well established that an ALJ must consider evidence showing that claimant is unable to afford medical care before discounting her credibility based upon failure to pursue or comply with treatment.  *See, e.g.*, *Beegle v. Soc. Sec. Admin., Comm'r*, 482 Fed. Appx. 483, 487 (11th Cir. July 23, 2012) (per curiam) ("[T]he ALJ may not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue medical treatment without first considering any explanations that might explain the failure to seek or pursue treatment."); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (recognizing prior holdings that poverty may excuse noncompliance);  SSR 96-7p, 1996 WL 374186 at *7-8 (providing that the adjudicator must consider information in the case record that may explain gaps in the medical record); *see also Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (" 'To a poor person, a medicine that he cannot afford to buy does not exist.' ").  Here,

as the ALJ recognizes, the record is replete with references to Plaintiff's inability to afford treatment, [*see, e.g.*, R146, 217-18, 410-11; *see also* R394-95 (noting that Plaintiff reported non-compliance and gaps in treatment "secondary to finances")], yet the ALJ fails to explain why Plaintiff's reports of inability to afford treatment either are not believable or are an inadequate explanation for her noncompliance and the gaps in her treatment record, [*see* R393-95].

To be sure, Eleventh Circuit precedent holds that an ALJ's failure to determine whether the claimant was able to afford treatment does not constitute reversible error if the failure to seek or follow treatment is not one of the principal factors in the ALJ's decision. *See, e.g., Brown v. Comm'r of Soc. Sec.*, 425 Fed. Appx. 813, 817 (11th Cir. Apr. 27, 2011); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). In this case, however, the failure to seek or follow treatment cannot be said to be anything but a principal factor in the ALJ's decision, as the ALJ referred to Plaintiff's lack of treatment *five times* and cited the lack of treatment as support not only as one reason among several for finding Plaintiff's allegations of limitation to be less than fully credible but also cited the lack of treatment to support his decision to credit the opinions of the reviewing physicians over the opinions of the treating physician and the examining physician. [*See* R393-95].

Thus, the undersigned concludes that the case is due to be **REVERSED** and **REMANDED** so that the ALJ may reconsider the import of Plaintiff's non-compliance with treatment and the gaps in her medical record in light of her stated inability to afford treatment—and the impact of that finding on his evaluation of Plaintiff's credibility and the weight given the opinions of Dr. Tiliakos and Dr. Ajayi.

**B.      *Opinions of Drs. Tiliakos and Ajayi***

In addition to impermissibly discounting the opinion of treating-physician Dr. Tiliakos and examining-physician Dr. Ajayi on the grounds of Plaintiff's sporadic medical treatment without first considering her ability to pay, the ALJ explained that he determined that the opinion of Dr. Tiliakos was not entitled to full credit because "Dr. Tiliakos was vague," he "did not specify the timeframe in which [Plaintiff] became disabled," and "the medical evidence does not support Dr. Tiliakos's disabling limitations," and that the opinion of Dr. Ajayi was entitled only to "some weight" because he was a one-time examiner.   [R395].   These determinations also bear revisiting upon remand.

The Commissioner evaluates every medical opinion the agency receives, regardless of the source.   20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled,

AO 72A
(Rev.8/8
2)

we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case."). Thus, both examining and nonexamining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). In assessing the medical evidence, the ALJ is "required to state with particularity the weight [given] to the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

AO 72A
(Rev.8/8
2)

The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.[22]   *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)); *accord Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).  A one-time examining (i.e., consulting) physician's opinion is not entitled to great weight.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam).  However, the opinion of an examining physician is generally entitled to more weight than the opinion of a nonexamining physician. *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  Also, in the Eleventh Circuit, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence." *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam).  However, "the opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions

---

[22]    Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips*, 357 F.3d at 1241.

39

AO 72A
(Rev.8/8
2)

of examining physicians or other medical evidence in the record." *Hogan v. Astrue*, Civ. Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (harmonizing Eleventh Circuit cases).  In any event, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (quotation marks omitted).

Indeed, Dr. Ajayi was a one-time examiner.  [*See* R217-26].  And within the four corners of the physical-capacities evaluation Dr. Tiliakos completed, his opinion is somewhat vague, stating simply that Plaintiff has RA; that when the RA is active, she requires the freedom to rest, recline, or lie down at her own discretion and is incapable of work requiring any exertional or manipulative effort; that the level of severity had lasted for "several years"; and that the condition was consistent with his clinical findings of diffuse synovitis with joint effusion and joint contracture.  [R357-60].

However, the fact that Dr. Ajayi was a one-time examiner is just one of the many factors the ALJ was required to consider in determining the weight of his opinion.  *See* 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).  And Dr. Tiliakos's treatment notes make clear that the bases for his opinion were physical examinations showing that Plaintiff had consistent pain and swelling; a decreased range of motion in her shoulders; synovitis in the wrists, ankles, and the joints of both hands, the right worse than the left;

40

knees with tense effusions; and difficulty standing and walking; and at times, she was in "acute distress." [*See, e.g.*, R362-64]. Thus, rejecting Dr. Tiliakos's opinion for vagueness makes little sense.[23]

The Court is further troubled by the ALJ's explanation that he found the opinions unsupported by the objective medical findings. Dr. Ajayi's examination notes indicate that he reviewed Plaintiff's x-rays, noted her obesity, observed Plaintiff's station and gait, and tested her strength and range of motion, [R217-26], and Dr. Tiliakos's notes indicate that he also reviewed x-rays, made similar physical examinations, and also made serology studies, [R362-65]. It also bears noting that while the ALJ stated that he considered the effects of Plaintiff's obesity in the RFC assessment, he used boilerplate language and did not explain how he found Plaintiff's obesity to affect the RFC, [R394-95], and moreover, that the x-ray evidence shows mild-to-moderate osteoarthrosis, [R220-21, 223], which could quite reasonably be exacerbated by Plaintiff's RA and obesity to levels at or approaching the limitations stated in the opinions of Dr. Tiliakos and Dr. Ajayi, [R218, 224-26, 357-60], yet the ALJ chose to

---

[23]    The Court also finds the Commissioner's position that the ALJ had no need to call upon a medical advisor to determine Plaintiff's disability onset date because the medical evidence was "adequate and not ambiguous," incongruent with the ALJ's determination that Dr. Tiliakos's opinion was "vague." [*Compare* Doc. 14 at 15 *with* R395].

acknowledge only the radiologist's interpretation of the studies and not the opinions of the treating and examining physicians.  [*See* R394-95].

For these reasons, the Court finds it entirely unclear whether the ALJ fully considered the regulatory factors and the effect of Plaintiff's obesity in determining the weight to assign to the opinions of Dr. Tiliakos and Dr. Ajayi.  Thus, the undersigned concludes that the ALJ did not show "good cause" for declining to give substantial weight to the opinion of Dr. Tiliakos and did not supply substantial evidence to support his decision to give only "some weight" to the opinion of Dr. Ajayi.  Accordingly, the case is also due to be **REVERSED** and **REMANDED** so that the ALJ may explain the impact of Plaintiff's obesity on his RFC assessment, reconsider the weight given the opinions of Dr. Tiliakos and Dr. Ajayi after full consideration of the regulatory factors, and, if appropriate, call on the services of a medical advisor to determine the disability onset date.

### C.      *Credibility*

Plaintiff has also shown that several other aspects of the ALJ's credibility determination bear further consideration upon remand.  The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility of testimony is limited by his

42

obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). In evaluating a claimant's credibility, the ALJ must consider the evidence of the claimant's daily activities; the location, duration, frequency, and intensity of her symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment the claimant has received; any measures the claimant takes to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to the symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c). "The credibility determination does not need to cite 'particular phrases or formulations' but it cannot merely be a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotation marks omitted) (quoting *Foote*, 67 F.3d at 1561). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

Contrary to Plaintiff's argument, it is clear that the ALJ considered the regulatory factors in evaluating Plaintiff's credibility. However, as discussed above, he erred in

43

his consideration of Plaintiff's treatment regimen by failing to consider whether her failure to seek or comply with treatment was excused by her inability to afford treatment. As will be discussed further in this section, Plaintiff has also shown that the credibility evaluation was marred by other errors warranting correction upon remand.

### 1.    *"Disabled Individual"*

Plaintiff argues that the ALJ applied an improper legal standard when he discounted her credibility based on his finding that she had not generally received the type of medical treatment one would expect for a "disabled individual." [Doc. 13 at 20 [citing R393]]. Despite the ALJ's use of this phrase, it appears that the ALJ understood the proper legal standard. In his discussion of applicable law related to the RFC finding, the ALJ cited 20 C.F.R. §§ 404.1520(e) and 416.920(e), among other relevant regulations, and stated that "[a]n individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." [R391]. The ALJ also cited SSR 96-8p, [R391], the same administrative ruling cited by Plaintiff, [Doc. 13 at 20]. *See Jones v. Astrue*, No. 8:11-cv-611-T-30TBM, 2012 WL 171094, at *4 (M.D. Fla. Jan. 3, 2012) (where plaintiff argued that ALJ appeared to use improper "totally disabled" standard, the court found otherwise "in the light of the ALJ's explication of the issues and the applicable

standards for evaluating the same set forth earlier in the decision"); *Rahman v. Astrue*, Civil Action No. 1:11-CV-3094-JSA, 2012 WL 5507314, at *11 n.5 (N.D. Ga. Nov. 14, 2012) (Anand, M.J.) (rejecting argument that ALJ applied an incorrect legal standard in stating that "claimant has not generally received the type of medical treatment one would expect for a totally disabled individual" because "a review of the ALJ's decision as a whole suggests that the ALJ understood the proper legal standard for awarding benefits" and claimant portrayed self at hearing as "totally disabled individual"). *Cf. McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (affirming district court although lower court's statement, after restating evidence upon which denial of disability benefits claim was based, that "substantial evidence supported a finding that [disability benefits claimant] was totally disabled," was not proper standard of reviewing denial of benefits, because district court assumed to have applied proper standard and to have weighed evidence properly by virtue of its initial recitation of proper test).

Nevertheless, the use of the term "disabled individual" is ill-advised because it results in confusion. Unless the claimant is found to meet a listing, the ALJ must consider the claimant's residual functional capacity, age, education, past work experience, and whether claimant can do her past work or other available work, before

45

he may reach the ultimate determination of whether a claimant is "disabled."  *See* 20 C.F.R. §§ 404.1520(a)(4), (e), 416.920(a)(4), (e); SSR 96-8p.   The relevant credibility question is whether substantial evidence undermines the plaintiff's testimony as to the extent of her limiting impairments.  *See Foote*, 67 F.3d at 1562.  Only then may the ALJ take the next steps toward determining what "disabled" ultimately means in Plaintiff's particular case.  Thus, should the ALJ upon remand again find that the evidence undermines some aspect of Plaintiff's allegations of limitation, he should articulate the allegation he finds unworthy and the evidence that undermines it.

## 2.   *Activities of Daily Living*

Plaintiff also argues that the ALJ erred in finding that Plaintiff's daily activities supported his determination that Plaintiff's RFC was less restrictive than she alleged. [Doc. 13 at 23-24 [citing R395]].  She points out that the ALJ did not mention any of her daily activities and contends that there is no evidence of any daily activities contrary to her testimony.  [Doc. 13 at 23-24].

In response, the Commissioner contends that the ALJ properly discounted Plaintiff's credibility based on Plaintiff's testimony that between 2004 and 2010, she sometimes made sure her child went to school on time, and she cooked occasionally when she was feeling well, [R412-13], and a May 2004 medical history questionnaire

46

in which she indicated that she exercised, [R247].  [Doc. 14 at 25].  She asserts therefore that substantial evidence supports the ALJ's determination that Plaintiff's activities of daily living undermine her claims of limitation.  [*Id*.].

The Court agrees that the ALJ's characterization of Plaintiff's daily activities as inconsistent with her claims of limitation also amounts to reversible error.  First, the Court cannot agree that the cited evidence constitutes even a scintilla of evidence showing that Plaintiff's daily activities exceeded her alleged limitations.  Examination of the transcript the Commissioner cites reveals that Plaintiff testified that during the relevant time period, her child was in high school, and she could not do much to care for him:

> Q    So were you responsible for making sure that the child got up and went to school on time?
>
> A    Well, sometimes I did because I couldn't get up and I wasn't able to walk well.
>
> . . .
>
> Q    Okay.  When your child was home, were you able to cook for him and your husband?
>
> A    Sometimes I was feeling well, sometimes I wasn't feeling well.  I wasn't walking, so my husband brought me food to eat.

47

[R412-13].   The cited medical history form is similarly benign: it shows that at Plaintiff's initial visit to Resurgens, shortly after the alleged onset date, she simply responded to the question "Do you exercise?" by checking the box marked "yes." [R247].  The Court finds this scant evidence of ability to function insufficient to show that Plaintiff retained more functional capability than she claimed.

Second, to presume that the ALJ relied on this evidence in support of his credibility determination would be to undertake an impermissible *post hoc* rationalization.  The ALJ made no reference to Plaintiff's ability to cook, care for her child, or exercise.  [*See* R389-97].  It would be improper for the Court to draw *post hoc* conclusions from the evidence.   *See Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) ("If an action is to be upheld it must be upheld on the . . . bases articulated in the agency's order.") (citing *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)); *Patterson v. Chater*, 983 F. Supp. 1410, 1413 (M.D. Fla. 1997) (holding that it is the duty of the ALJ—and not the court—to draw inferences from the evidence and resolve conflicts in the evidence); *see also Hendrix ex rel. S.F.H. v. Astrue*, No. 1:12-cv-2086, 2013 WL 4718223, at *16 (N.D. Ga. Sept. 3, 2013) (Duffey, J., *adopting* Scofield, M.J.) ("An ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without

48

articulating specific, well supported reasons for crediting some evidence while discrediting other evidence.") (citing *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992) (per curiam)).

Thus, because the ALJ purported to rely on Plaintiff's activities of daily living in support of his determination that Plaintiff's RFC was greater than alleged, yet there appears to be no such evidence in the record, remand is required.

### 3.   *"Sit and Squirm"*

Plaintiff also contends that when the ALJ stated that Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing," [R393], was another factor influencing his decision, he was imposing an improper sit-and-squirm test.  [Doc. 13 at 20 (citing *Wilson v. Heckler*, 734 F.2d 513 (11th Cir. 1984))].  She further argues that even if it were not prohibited for an ALJ to make legal judgments based on physical appearance, it constitutes a denial of due process for the ALJ to rely on his personal observations without giving the claimant the opportunity to challenge the ALJ's personal observations at the hearing.  [Doc. 13 at 20-21 (citing *Richardson v. Perales*, 402 U.S. 389 (1971))].

In response, the Commissioner points out that a "sit and squirm" test involves an ALJ subjectively arriving at an index of traits that he expects the claimant to

49

manifest at the hearing, then denying the claim if the claimant falls short of the index. [Doc. 14 at 22 (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982))]. She contends that although personal observations cannot be the sole basis for an adverse credibility finding, an ALJ may consider a claimant's demeanor along with other evidence.   [Doc. 14 at 21-22 (citing *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987); *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985); 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.929(c)(3)(vii); SSR 96-7p)].   She argues that here, the ALJ properly considered his personal observations of Plaintiff's demeanor along with the other evidence.  [Doc. 14 at 22 [citing R393]].

The Court is persuaded that the ALJ erred in his evaluation of Plaintiff's appearance and demeanor.  First, the Commissioner's point is well taken that where a claimant attends an administrative proceeding before an ALJ, the ALJ may consider "his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."   SSR 96-7p; *see also Norris*, 760 F.2d at 1158.  In *Norris*, the Eleventh Circuit held that where the ALJ properly considered the claimant's testimony and did not impose his observations in lieu of a consideration of the medical evidence presented, it was not error for the ALJ also to consider the claimant's demeanor among other criteria in making credibility

50

determinations.  *Norris, id.* (distinguishing *Freeman*, 681 F.2d at 731 (reversing and remanding for further consideration where the ALJ "substituted his judgment of the claimant's condition for that of the medical and vocational experts")).

In this case, however, it is not at all clear that the ALJ did not rely at least in part on his own observations of Plaintiff's demeanor as a basis for declining to fully adopt the medical opinions submitted by treating physician Dr. Tiliakos and examining physician Dr. Ajayi, and thus, the Court cannot find that his reliance on his observations of Plaintiff's appearance and demeanor falls within the distinction set out in *Norris*.  [*See* R393].  As previously discussed, the ALJ did not show that substantial evidence supported his decisions to discount the weight given the opinions of Dr. Tiliakos and Dr. Ajayi, *see supra* Part VI.B., and notably, the ALJ's discussion of Plaintiff's appearance and demeanor falls within the section of his decision in which he discusses the objective medical findings and opinions, [R393-95], suggesting that the ALJ viewed his observations not merely as lay witness evidence but instead as medical evidence.  Reinforcing this impression is the fact that in discussing Plaintiff's demeanor, the ALJ did not consider his "recorded observations" of Plaintiff's demeanor as directed in SSR 96-7p but instead rendered a generalized opinion that Plaintiff's appearance and demeanor at the hearing was "generally unpersuasive," suggesting that

51

he somehow had the expertise to make judgments about whether Plaintiff's tolerance of the hearing was inconsistent with her severe RA, degenerative joint disease, morbid obesity, hypertension, hypothyroidism, dyslipidemia, and depression and the resulting limitations Plaintiff—and Drs. Tiliakos and Ajayi—described.  Thus, it appears likely that the ALJ did engage in the sort of "sit and squirm" jurisprudence proscribed in *Freeman*.  This error must also be addressed upon remand.

### D.     Language Limitation

Plaintiff further contends that the ALJ's is subject to reversal because despite the ALJ's determination that Plaintiff "is illiterate in English and has a very limited ability to communicate in English," [R395], none of the hypothetical questions posed to the VE included Plaintiff's illiteracy or inability to communicate in English, [R421-23].  [Doc. 13 at 17 (citing *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985))].  She also argues that her inability to communicate in English would significantly erode the occupational base at both the light and the sedentary exertional levels.  [Doc. 13 at 17-18 (citing 20 C.F.R. Pt. 404, Subpt. P, app. 2, §§ 201.17, 202.00(g); SSR 96-9p)].

In response, the Commissioner concedes that the regulations explain that "[s]ince the ability to speak, read and understand English is generally learned or increased at school," it constitutes an educational factor to be considered in the vocational

52

evaluation. [Doc. 14 at 17 (quoting 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5))]. She argues, however, that because the VE was present at the hearing and heard Plaintiff's testimony, through an interpreter, that she had a sixth-grade education and could read and write a little in Spanish, [R405, 409-10], and the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience, [R421], the ALJ accounted for Plaintiff's illiteracy and inability to communicate in English. [Doc. 14 at 17]. The Commissioner also contends that even if the ALJ should have included illiteracy or inability to speak English in the hypothetical question, the omission is harmless because illiteracy or inability to speak English is not a significant factor affecting the availability of unskilled light work that has already been reduced to jobs requiring only simple, routine, and repetitive tasks. [*Id.* at 17-18 (citing *Davila v. Colvin*, No. 8:12-cv-2334, 2014 WL 495525, at \*13 (M.D. Fla. Feb. 5, 2014); 20 C.F.R. Pt. 404, Subpt. P, app. 2, §§ 201.17, 202.00(g))].

Plaintiff's cursory argument does little to persuade the Court that the omission of the English-language limitation from the hypothetical question alone would have constituted reversible error. [*See* Doc. 13 at 17]. *Pendley*, the sole case Plaintiff cites in support of her argument that it is not proper to assume that a VE considered evidence simply because he or she was aware of it, is readily distinguishable: language skills

53

were not at issue in *Pendley*; instead, in *Pendley*, it was the claimant's severe impairments of anxiety and depression that were omitted from the hypothetical question. *Pendley*, 767 F.2d at 1562-63. Presuming that a VE understood from testimony that the claimant had mental-health impairments and then independently applied his or her determination regarding the alleged mental-health impairments is fundamentally different from presuming that a VE who heard foreign-language testimony through an interpreter that the claimant had a sixth-grade education and no English skills took that testimony into account when asked to consider the work available to a person of Plaintiff's educational level. Notably, Plaintiff does not argue that she was prejudiced by the alleged error, [*see* Doc. 13 at 17], and although Plaintiff was represented at the hearing by an attorney who cross-examined the VE, the attorney did not press the VE on whether a person could perform the listed jobs if they could not speak or write English, [R422-25]. Moreover, as the Commissioner points out, the regulations provide that with regard to unskilled jobs primarily involving working with things, "literacy or the ability to communicate in English has the least significance," and thus, Plaintiff's illiteracy appears unlikely to significantly reduce the number of jobs in the occupations relied upon by the ALJ in this case. *See Davila*, 2014 WL 495525 at *13; 20 C.F.R. Pt. 404, Subpt. P, app. 2, §§ 201.17, 202.00(g).

54

Be that as it may, the case is already due to be remanded upon myriad other grounds, [*see supra* Part VII, *passim*], and according to the *Dictionary of Occupational Titles* ("DOT"), the occupations relied upon by the ALJ for his finding that jobs were available to Plaintiff—at least until she attained fifty years of age—exceed the language abilities of a person who cannot communicate in English.  Small parts assembler (DOT 706.684-022) and laundry folder (DOT 369.687-018) require language skills at General Education Development ("GED") Language Development Level 01:

Reading:

Recognize meaning of 2,500 (two- or three-syllable) words.  Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

U.S. Dep't of Labor, *Dictionary of Occupational Titles*, App. C (4th ed., rev. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

55

AO 72A
(Rev.8/8
2)

Electronics worker (DOT 726.687-010) carries GED Language Development Level 2, which requires even greater language skills:

> Reading:
>
> Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
> Writing:
>
> Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.
>
> Speaking:
>
> Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

*Id.* The VE's testimony does not account for the difference between the inconsistency between the DOT and the ALJ's determination that Plaintiff can perform the work despite her illiteracy. [*See* R419-25]. Thus, upon remand, the ALJ must also reevaluate the occupations available to Plaintiff—which may include taking VE testimony as necessary—in light of her English-proficiency restriction.

56

**E.     *Request for Remand for Calculation and Payment of Benefits***

Plaintiff requests that the Court reverse the decision of the Commissioner without remand for further proceedings, but instead for calculation and payment of benefits. [Doc. 13 at 26].  Because the errors enumerated above require reevaluation of the existing evidence and may require the solicitation and consideration of additional evidence from a medical advisor to determine limitation onset dates and additional testimony from a VE in response to a complete hypothetical question, the Court finds that it would be improper to grant the request.

Accordingly, the Court hereby **REVERSES** the final decision of the Commissioner and **REMANDS** it for further proceeding in order to correct the errors identified above.[24]

---

[24]     The Court recognizes that Plaintiff also "asks the Court [to] state it is not affirming any portion of the decision of the Commissioner, even if not specifically mentioned in its order." [Doc. 13 at 26].  It is not clear to the Court what Plaintiff is requesting, why, or upon what grounds.  The issue—whatever it is—is therefore not properly before the Court, and it shall receive no further consideration. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on the argument or provide a citation to authority regarding the argument).

AO 72A
(Rev.8/8
2)

## VIII.  CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED**, this the 29th day of March, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE